Barry I. Levy, Esq.
Michael Vanunu, Esq.
Allison N. Stapleton, Esq.
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs Government Employees Insurance
Company, GEICO Indemnity Company, GEICO General
Insurance Company and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY, GEICO
GENERAL INSURANCE COMPANY and GEICO
CASUALTY COMPANY,

                      Plaintiffs,

        -against-

ERIC KENWORTHY, M.D., ERIC KENWORTHY MD (A
Sole Proprietorship), ERIC KENWORTHY (A Sole
Proprietorship), YANA MIRONOVICH, NEW YORK
BILLING & PROCESSING CORP. and JOHN DOE
DEFENDANTS "1" through "10",

                      Defendants.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Docket No.:_____ (    )

**Plaintiff Demands a Trial by
Jury**

## COMPLAINT

Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO

General Insurance Company and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"),

as and for their Complaint against Defendants Eric Kenworthy, M.D., Eric Kenworthy MD (A Sole

Proprietorship), Eric Kenworthy (A Sole Proprietorship),Yana Mironovich, New York Billing and

Processing Corp., and John Doe Defendants "1" through "10" (collectively, referred to hereinafter

as the "Defendants"), hereby allege as follows:

## <u>NATURE OF THE ACTION</u>

1.      This action seeks to recover more than $165,000.00 that the Defendants have wrongfully obtained from GEICO by submitting, and causing to be submitted, thousands of fraudulent no-fault insurance charges relating to medically unnecessary, illusory, and otherwise non-reimbursable healthcare services styled as extracorporeal shockwave therapy ("ESWT"). The Fraudulent Services allegedly were provided to New York automobile accident victims who were insured by GEICO ("Insureds").

2.      In addition to recovering the money wrongfully obtained, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1 million in pending no-fault insurance claims for the Fraudulent Services because:

(i)     the Fraudulent Services were allegedly provided by and billed through the Kenworthy Practices (as defined below), which are medical "practices" not under the control and direction of Eric Kenworthy, M.D., but rather, were at all relevant times operated, managed, and controlled by the John Doe Defendants and others for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers;

(ii)    the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics (as defined below);

(iii)   the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds;

(iv)    the claim submissions seeking payment for the Fraudulent Services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided to Insureds; and

(v)     the Fraudulent Services, to the extent provided at all, were not provided by Eric Kenworthy, M.D. or any other licensed physician, but by persons who were unlicensed, and were neither directly supervised by Eric Kenworthy, M.D. or employed by him or any of the Kenworthy Practices.

3.    Defendant Eric Kenworthy, M.D. ("Kenworthy") is a New York physician who purports to own and operate two medical "practices" as sole proprietorships using two separate tax identification numbers, which are: (i) the Eric Kenworthy sole proprietorship using tax identification number 11-332xxxx (the "EK Sole Proprietorship"); and (ii) the Eric Kenworthy MD sole proprietorship using tax identification number 54-898xxxx (the "EK MD Sole Proprietorship")(collectively, with the EK Sole Proprietorship, the "Kenworthy Practices"), and purports to have used the Kenworthy Practices to provide the Fraudulent Services, which primarily consisted of ESWT to more than three-hundred and twenty (320) GEICO Insureds in a period of approximately nine (9) months.

4.    In fact, Kenworthy, the EK Sole Proprietorship, and the EK MD Sole Proprietorship (collectively, the "Kenworthy Defendants"), in combination with the Yana Mironovich and New York Billing & Processing (collectively, the "Billing Defendants") and John Doe Defendants "1" through "10" (the "John Doe Defendants"), engaged in a massive fraudulent insurance scheme against GEICO and the New York automobile insurance industry in which they billed GEICO alone more than $1.2 million for the alleged performance of the Fraudulent Services from at least twenty (20) separate locations from June 9, 2021 through September 17, 2021 under tax identification number 11-3329719 and from at least four (4) separate locations from October 18, 2021 through March 11, 2022 under tax identification number 54-8988346. Notably, more than 850 claim submissions were made to GEICO seeking payment of no-fault insurance benefits for the Fraudulent Services, all of which represented that Kenworthy was the legitimate owner of the Kenworthy Practices and that he allegedly performed all the Fraudulent Services. In truth, Kenworthy performed none of the Fraudulent Services and did not legitimately own, operate, manage or control the Kenworthy Practices.

5.      In or about 2021, the Defendants engineered this fraudulent scheme on the heels of material changes adopted by the New York Department of Financial Services regarding the application of the New York Workers Compensation Fee Schedule ("Fee Schedule") to New York's no-fault reimbursement. Those changes eliminated billing abuses and fraudulent treatment practices that had plagued the automobile insurance industry for more than a decade by, among other things: (i) making many services that had been historically abused either ineligible for reimbursement or subject to reduced reimbursement; (ii) limiting chiropractor billing to CPT codes in the chiropractic section of the fee schedule; and (iii) controlling reimbursement among providers who rendered concurrent care to patients by establishing daily reimbursement limits for all related disciplines.   For example, the changes to the Fee Schedule eliminated reimbursement for services for: (i) physical performance testing (e.g. CPT Code 97750), (ii) range of motion testing (e.g. CPT Code 95851) and manual muscle testing (e.g. CPT Code 95831) because they had historically been subject to abuse.

6.      In contrast to these changes, the Fee Schedule changes did not materially alter reimbursement for performance of the Fraudulent Services and, importantly, for the first time established a definitive rate of reimbursement of approximately $700.00 for performance of ESWT, which has historically been a Category III Code (0101T) with a "BR" designation, meaning that definitive reimbursement had not previously been established. Prior to October 2020, ESWT was virtually never performed on automobile accident patients or billed to automobile insurers, in part because of the lack of established reimbursement and because – if properly performed – service required considerable investment, including direct involvement by a physician in the performance of the service and the use of physical equipment this is very costly and is not typically portable.

7.     Defendants seized on these changes in the Fee Schedule (or lack thereof). The Kenworthy Defendants in association with the Billing Defendants and the John Doe Defendants concocted a fraudulent treatment and billing scheme pursuant to which:

(i)     unlicensed "technicians" would allegedly render the Fraudulent Services on an itinerant basis at a large number of multidisciplinary clinics located throughout the New York metropolitan area that purported to provide treatment to patients with no-fault insurance, but which in actuality were organized to supply convenient, one-stop shops for no-fault insurance fraud (the "Clinics");

(ii)    the unlicensed "technicians" would then generate falsified reports to create a false justification for the performance of the medically unnecessary and illusory Fraudulent Services; and

(iii)   the reports, documents and bills for thousands of dollars per patient per date of treatment would be sent to New York automobile insurance companies, including GEICO, seeking payment for the performance of the Fraudulent Services.

8.     The success of the fraudulent scheme required coordination between the Kenworthy Defendants, the Billing Defendants, and the John Doe Defendants. In furtherance of the fraudulent scheme, they took the following actions:

(i)     Kenworthy allowed the Billing Defendants and the John Doe Defendants to use his name, medical license and the Kenworthy Practices to bill GEICO and other New York automobile insurance companies for the alleged performance of the Fraudulent Services;

(ii)    The Kenworthy Defendants associated with the Billing Defendants and other "processors" who are among the John Doe Defendants. Processors are individuals and/or entities within the no-fault industry who earn money by: (i) establishing relationships with laypersons that are associated with the Clinics; (ii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for services that are allegedly provided to individuals covered by no-fault insurance; and (iii) referring the no-fault billing and collection work to New York collection lawyers; and

(iii)   The Kenworthy Defendants, through the Billing Defendants and John Doe Defendants, established illegal referral and kickback arrangements with the owners and/or managers of the Clinics to allow the Defendants to access a steady stream of patients to be able to fraudulently bill GEICO and other

automobile insurers, and exploit New York's no-fault insurance system for financial gain without regard to genuine patient care.

9.     Once the pieces were in place, the Billing Defendants and John Doe Defendants: (i) used Kenworthy's medical license, tax identification numbers associated with the Kenworthy Practices and copies of his signature to generate large quantities of false and fraudulent documents, including NF-3 forms (i.e. bills), assignment of benefit forms, and medical records; and (ii) used the Kenworthy Practices as fictional healthcare "practices" to serve as the billing vehicles through which millions of dollars of billing for the Fraudulent Services could be submitted to GEICO and other New York automobile insurers.

10.     Because the Kenworthy Practices was nothing more than a shell to hide the participation of the Billing Defendants and John Doe Defendants in the scheme, it was equally critical to the success of the fraudulent scheme for the Kenworthy Defendants, the Billing Defendants, and John Doe Defendants to partner with New York collection attorneys who were willing to:

(i)     purport to represent the physician and the billing entity;

(ii)     provide for or arrange for "funding" (i.e. financing against receivables) of the fraudulent billing to be submitted to GEICO and other New York insurers in connection with the unlawful scheme through companies in which the attorney/law firms either owned or with whom they had relationships;

(iii)     pursue payment and collection against GEICO and other New York automobile insurers by knowingly (a) submitting fraudulent bills to the insurers for the Fraudulent Services, and (b) pursuing collection lawsuits and/or arbitrations seeking payment on the claims that were denied or claimed to have been improperly paid; and

(iv)     accept the insurance payments received from automobile insurers through their attorney IOLA/Trust accounts, and then distribute the payments to third-parties, including the John Doe Defendants.

11.     At the time, the Billing Defendants and the John Doe Defendants had an ongoing relationship with several collection attorneys, and because of their position in the industry and ongoing relationships, they had in their possession copies of documents used by the collection lawyers that would be needed to facilitate the funding (*i.e.* the securing of advances against the claims) and the billing and collections on the fraudulent claims, including documents such as retainer letters, payment directives, and funding agreements.

12.     At the time, the Billing Defendants and John Doe Defendants used the information received from Kenworthy to manufacture: (i) the claim documents necessary to support the fraudulent claim submissions, including assignment of benefits ("AOBs") forms and other medical records; (ii) the engagement letter and associated documents needed by the lawyers to bill and collect on the Fraudulent Services; and (iii) the funding agreements to present to the companies who were willing to advance money against the receivables ("the Funders"). Once the documents were in place with the Funders, the Funders began transferring money to the Billing Defendants the John Doe Defendants as "advances" against the claims for the Fraudulent Services. Neither the Billing Defendants nor the John Doe Defendants were signatories to the funding agreements, yet they received the money without risk and used the payments received from the Funders for their own benefit, as well as to pay individuals and entities to perpetuate the Defendants' fraudulent scheme.

13.     The Billing Defendants and the John Doe Defendants provided the package of documents associated with billing, collection, and funding efforts to the collection lawyers and thereafter, began to transfer the fabricated claim documents to the collection lawyers. Once the documents were processed into bills (i.e. "NF-3" forms) using the names of the Kenworthy

Practices, the collection lawyers organized the claim submissions and mailed them to GEICO and other insurance companies seeking payment.

14.    The collection lawyers:

(i)     purported to represent Kenworthy and the Kenworthy Practices in hundreds of writings sent to GEICO;

(ii)    arranged and/or interfaced to effectuate the "funding" of the bills that were submitted to GEICO and other New York insurers in the name of the Kenworthy Practices;

(iii)   systemically pursued payment and collection against GEICO and other New York automobile insurers on behalf of the Kenworthy Practices; and

(iv)    collected insurance payments from GEICO and other New York automobile insurers and deposited those payments into their IOLA/Trust Accounts.

15.    As discussed herein, the Defendants at all relevant times have known that: (i) Kenworthy was not the true owner or in control of the Kenworthy Practices, but that they were owned, operated, managed and controlled by the Billing Defendants and the John Doe Defendants for purposes of effectuating a large scale insurance fraud scheme; (ii) the Fraudulent Services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the Fraudulent Services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; and (iv) the Fraudulent Services, to the extent provided at all, were never provided by Kenworthy or any other licensed physician but by persons who were never supervised by Kenworthy or employed by the Kenworthy Practices. The chart annexed hereto as Exhibit "1" sets forth a representative sample of the fraudulent claims that Defendants submitted, or caused to be submitted, to GEICO.

16.     Defendants do not now have – and never had – any right to be compensated for or to realize any economic benefit from the Fraudulent Services that they billed to GEICO.

17.     Defendants' fraudulent scheme began in 2021 and has continued uninterrupted through the present day as Defendants continue to seek collection on pending charges for the Fraudulent Services. As a result of the Defendants' fraudulent scheme, GEICO has incurred damages of more than $165,000.00.

## THE PARTIES

### I.     Plaintiffs

18.     Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company are Nebraska corporations with their principal places of business in Chevy Chase, Maryland. GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.    Defendants

19.     Defendant Kenworthy resides in and is a citizen of New York. Kenworthy is a physician licensed to practice medicine, who agreed to allow for the creation of the Kenworthy Practices and to "front" as their owners while allowing the Billing Defendants and the John Doe Defendants to use his license and the Kenworthy Practices as billing "vehicles" as part of the fraudulent scheme committed against GEICO and other New York automobile insurers.

20.     The EK Sole Proprietorship is a New York sole proprietorship that lists its' principal place of business as 359 Clinton Street, Brooklyn, New York (the "Clinton Street Location").

21.     The EK MD Sole Proprietorship is a New York sole proprietorship that operates at multiple Clinics throughout the New York Metropolitan area, and purports to have a principal

place of business in Brooklyn, New York that is the office of a law firm concentrating in No-Fault insurance collections.

22.    Defendant New York Billing and Processing Corp. is a New York corporation with its principal place of business at 3063 Brighton 8th Street, Brooklyn, New York. Defendant Yana Marinovich is the corporation's owner and sole shareholder.

23.    Defendant Yana Marinovich resides in and is a citizen of New York.

24.    The Billing Defendants are known within the industry as "Processors" and knowingly participated in the fraudulent scheme against GEICO by: (i) establishing relationships with the laypersons that are associated with the Clinics where Kenworthy purported to provide Fraudulent Services; (ii) collecting the paperwork from the Clinics for services that were purportedly provided to Insureds; and (iii) and using the name and signature of Kenworthy and the Kenworthy Practices to have the billing for the Fraudulent Services "funded" through the John Doe Defendants so that they could receive advances against the value of the collections on the bills for Fraudulent Services that they intended to submit to GEICO and other New York automobile insurers.

25.    John Doe Defendants are citizens of New York. John Doe Defendants "are unlicensed, non-professional individuals and entities, presently not identifiable to GEICO, who knowingly participated in the fraudulent scheme with the Kenworthy Defendants by: (i) unlawfully operating, managing and controlling the Kenworthy Practices; (ii) establishing relationships with the laypersons associated with the Clinics; (iii) collecting the no-fault claims (i.e. the paperwork) from the Clinics for the Fraudulent Services; (iv) arranged for and provided the funding associated with the Fraudulent Services; and (v) referring the no-fault billing and collection work associated with the Fraudulent Services to New York collection lawyers.

## JURISDICTION AND VENUE

26.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §

1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of

interests and costs, and is between citizens of different states.

27.     Pursuant to 28 U.S.C. § 1331, this Court has jurisdiction over the claims brought

under 18 U.S.C. §§ 1961 et seq., the Racketeer Influenced and Corrupt Organizations ("RICO")

Act, because they arise under the laws of the United States. In addition, this Court has supplemental

jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. §

1367.

28.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern

District of New York is the District where one or more of the Defendants reside and because this is

the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

29.     GEICO underwrites automobile insurance in New York.

## I.     An Overview of Pertinent Law Governing No-Fault Reimbursement

30.     New York's no-fault laws are designed to ensure that injured victims of motor vehicle

accidents have an efficient mechanism to pay for and receive the health care services that they need.

Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§

5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)

(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide

Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

31.     No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses

incurred for health care goods and services, including medical services.

32.     An Insured can assign his/her right to No-Fault Benefits to health care goods and services providers in exchange for those services.

33.     Pursuant to a duly executed assignment, a health care provider may submit claims directly to an insurance company and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or, more commonly, as an "NF-3").   In the alternative, a health care provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 form").

34.     Pursuant to the No-Fault Laws, professional corporations are not eligible to bill for or to collect No-Fault Benefits if they fail to meet any New York State or local licensing requirements necessary to provide the underlying services.

35.     The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.16(a)(12) states, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement under section 5102(a)(1) of the Insurance Law if the provider fails to meet any applicable New York State or local licensing requirement necessary to perform such service in New York ….   (Emphasis added).

36.     In New York, only a licensed physician may: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; and (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

37.     Unlicensed non-physicians may not: (i) practice medicine; (ii) own or control a medical professional corporation; (iii) employ and supervise other physicians; or (iv) absent statutory exceptions not applicable in this case, derive economic benefit from physician services.

38.     New York law prohibits licensed healthcare services providers, including physicians, from paying or accepting kickbacks in exchange for patient referrals. See, e.g., New York Education Law §§ 6509-a; 6530(18); and 6531.

39.     New York law prohibits unlicensed persons not authorized to practice a profession, like medicine, from practicing the profession and from sharing in the fees for professional services. See, e.g., New York Education Law § 6512, § 6530(11), and (19).

40.     Therefore, under the No-Fault Laws, a health care provider is not eligible to receive No-Fault Benefits if it is fraudulently licensed, if it pays or receives unlawful kickbacks in exchange for patient referrals, if it permits unlicensed laypersons to control or dictate the treatments, or allows unlicensed laypersons to share in the fees for the professional services.

41.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005) and Andrew Carothers, M.D., P.C. v. Progressive Ins. Co., 33 N.Y.3d 389 (2019), the New York Court of Appeals made clear that: (i) healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits; and (ii) only licensed physicians may practice medicine in New York because of the concern that unlicensed physicians are "not bound by ethical rules that govern the quality of care delivered by a physician to a patient."

42.     Pursuant to the No-Fault Laws, only health care providers in possession of a direct assignment of benefits are entitled to bill for and collect No-Fault Benefits. There is both a statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than the patient or his/her health care provider. The implementing regulation adopted by the Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, states – in pertinent part – as follows:

> An insurer shall pay benefits for any element of loss … directly to the applicant or ... upon assignment by the applicant ... shall pay benefits directly to providers of health care services as covered under section five thousand one hundred two (a)(1) of the Insurance Law …

43.     Accordingly, for a health care provider to be eligible to bill for and to collect charges from an insurer for health care services pursuant to Insurance Law § 5102(a), it must be the underline actual provider of the services. Under the No-Fault Laws, a professional corporation is not eligible to bill for services, or to collect for those services from an insurer, where the services were rendered by persons who were not employees of the professional corporation, such as independent contractors.

44.     In New York, claims for No-Fault Benefits are governed by the New York Workers' Compensation Fee Schedule (the "NY Fee Schedule").

45.     When a healthcare services provider submits a claim for No-Fault Benefits using the current procedural terminology ("CPT") codes set forth in the NY Fee Schedule, it represents that: (i) the service described by the specific CPT code was performed on the patient; (ii) the service described by the specific CPT code was performed in a competent manner and in accordance with applicable laws and regulations; (iii) the service described by the specific CPT code was reasonable and medically necessary; and (iv) the service and the attendant fee were not excessive.

46.     Pursuant to New York Insurance Law § 403, the NF-3s and HCFA-1500 forms submitted by a health care provider to GEICO, and to all other automobile insurers, must be verified by the health care provider subject to the following warning:

> Any person who knowingly and with intent to defraud any insurance company or other person files an application for insurance or statement of claim containing any materially false information, or conceals for the purpose of misleading, information concerning any fact material thereto, commits a fraudulent insurance act, which is a crime.

## II.     Defendants' Fraudulent Scheme

### A.     Dr. Kenworthy and His Recruitment

47.     Kenworthy is a physician who specializes in Internal Medicine. Kenworthy became licensed to practice medicine in New York in 2006.

48.     According to public record searches, Kenworthy is currently affiliated with Mount Sinai, but primarily works through the EK Sole Proprietorship under the name "Kenworthy Medical Care" at the Clinton Street Location:



49.     According to information published by Kenworthy, at Kenworthy Medical Care, (i) he acts as a "general, primary care physician, responsible for your everyday medical needs and helping ensure that your health is in tip-top shape" and (ii) "is most concerned with the prevention of serious illness". In addition, Kenworthy promotes "concierge medicine" where he "provides patients with a more intimate and comfortable health experience . . . such as 24 hours/day house calls, in-office suturing and individual, attentive patient care."

50.     Despite the EK Sole Proprietorship purporting to operate out of the Clinton Street Location under the name Kenworthy Medical Care, Kenworthy and the EK Sole Proprietorship represented in its bills to GEICO that it operated from more than twenty (20) separate locations in

Queens, Brooklyn, the Bronx, and other surrounding counties, none of which included the Clinton Street Location. In contrast to the Clinton Street Location, Kenworthy has never publicly represented that he practiced medicine and/or operated at any of the 20 locations identified in the bills to GEICO.

51.     In 2021, Kenworthy was recruited by the John Doe Defendants to participate in a complex insurance fraudulent scheme to bill GEICO and other New York automobile insurers millions of dollars for medically unnecessary, experimental, and otherwise non-reimbursable services. Based on the arrangement, Kenworthy would receive a periodic payment in exchange for allowing his name, signature and medical license as well as the tax identification numbers of the Kenworthy Practices to be used and would contend that he supervised the Fraudulent Services if any insurance company ever inquired.

52.     At the time, Kenworthy was a perfect candidate for the scheme because he had an extended history of debt, including years of New York state and New York city tax delinquencies that totaled over $60,000.00.

### B.     Gaining Access to Insureds

53.     The EK Sole Proprietorship never had any legitimate indicia associated with the Fraudulent Services billed to GEICO.  The EK Sole Proprietorship purportedly had "offices" at twenty (20) separate Clinics, did not provide any fraudulent services at its actual operating location, *i.e.*, the Clinton Street Location, was not the owner or leaseholder of any of the real property from which it purported to provide the Fraudulent Services, did not employ their own support staff at the Clinics where it purported to provide the Fraudulent Services, and did not advertise or market its services at the Clinics to the general public.

54.     Similarly, the EK MD Sole Proprietorship has never had any legitimate indicia. It had no fixed treatment locations of any kind, did not maintain a stand-alone practice, was not the owner or leaseholder in any of the real property from which it purported to provide the Fraudulent Services, did not employ its own support staff, and did not advertise or market its services to the general public.

55.     In fact, the John Doe Defendants controlled the fraudulent scheme using the name of Kenworthy and the Kenworthy Practices on an itinerant basis from more than twenty-four (24) separate Clinics, located in Brooklyn, Queens, Bronx, and the surrounding counties, where they were given access to steady volumes of patients pursuant to the unlawful referral arrangements, including the following:

| Clinic - Street Address | Clinic – County |
|---|---|
| 3910 Church Avenue | Brooklyn |
| 1120 Morris Park Avenue | Bronx |
| 282 Avenue X | Brooklyn |
| 1655 Richmond Highway | Richmond |
| 1611 East New York Avenue | Brooklyn |
| 4250 White Plains Rd | Bronx |
| 150 Graham Ave | Brooklyn |
| 180-09 Jamaica Ave | Queens |
| 9801 Foster Ave | Brooklyn |
| 1894 Eastchester Rd | Bronx |
| 652 Fordham Rd | Bronx |
| 145 East Merrick Rd | Nassau |
| 2088 Flatbush Ave | Brooklyn |
| 358 Neptune Ave | Brooklyn |
| 30 South Central Ave | Nassau |
| 550 Remsen Ave | Brooklyn |
| 55 East 115th St | New York |
| 2273 65th St | Brooklyn |
| 240-19 Jamaica Ave | Queens |
| 1122 Coney Island Ave | Brooklyn |
| 9046 Corona Ave | Queens |
| 6642 Myrtle Ave | Queens |
| 14 North Main St | Rockland |

| 647 Bryant Ave | Bronx |
|---|---|

56.     To obtain access to the Clinics' patient base (*i.e.*, the Insureds), the Defendants entered into illegal financial and kickback arrangements with the unlicensed persons who controlled the Clinics, who provided access to the patients that were treated, or who purported to be treated, at the Clinics. Though ostensibly organized to provide a range of healthcare services to Insureds at a single location, the Clinics in actuality, were organized to supply "one-stop" shops for no-fault insurance fraud.

57.     The Clinics provided facilities for Defendants, as well as a "revolving door" of healthcare services professional corporations, chiropractic professional corporations, physical therapy professional corporations, and/or a multitude of other purported healthcare providers, all geared towards exploiting New York's no-fault insurance system.

58.     In fact, GEICO received billing from an ever-changing number of fraudulent healthcare providers at many of the Clinics, starting and stopping operations without any purchase or sale of a "practice", without any legitimate transfer of patient care from one professional to another, and without any legitimate reason for the change in provider name beyond circumventing insurance company investigations and continuing the fraudulent exploitation of New York's no-fault insurance system.

59.     For example, GEICO received billing for purported healthcare services from the Defendants at the following locations, each of which contained an ever-changing number of fraudulent healthcare providers:

> (i)     The Clinic located at 3910 Church Avenue, Brooklyn, New York (the "Church Avenue Clinic") was a revolving door of more than 190 purportedly different healthcare providers;

(ii)     The Clinic located at 1120 Morris Park Avenue, Bronx, New York (the "Morris Park Avenue Clinic") was a revolving door of more than 130 purportedly different healthcare providers;

(iii)    The Clinic located at 1894 Eastchester Road, Bronx, New York (the "Eastchester Road Clinic") was a revolving door of more than 100 purportedly different healthcare providers;

(iv)     The Clinic located at 4250 White Plains Road, Bronx, New York (the "White Plains Road Clinic") was a revolving door of more than 75 purportedly different healthcare providers;

(v)      The Clinic located at 4 North Main Street, Spring Valley, New York (the "North Main Street Clinic") was a revolving door of more than 50 purportedly different healthcare providers; and

(vi)     The Clinic located at 1122 Coney Island Avenue, Brooklyn, New York (the "Coney Island Avenue Clinic") was a revolving door of more than 50 purportedly different healthcare providers.

60.     At each of the Clinics, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base. Clinics willingly provided patient access to the Defendants in exchange for kickbacks and other financial incentives because the Clinics were facilities that sought to profit from the "treatment" of individuals covered by no-fault insurance and therefore catered to a high volume of Insureds at the locations.

61.     In general, the referral sources at the Clinics were paid a sum of money in untraceable cash or payments typically disguised as "rent".  In reality, they were kickbacks for referrals, and the relationship was a "pay-to-play" arrangement. In connection with this arrangement, when an Insured visited one of the Clinics, he or she was automatically referred by one of the Clinic's "representatives" for the performance of the Fraudulent Services.

62.     As a result of this arrangement, the Defendants subjected Insureds at the Clinics to the Fraudulent Services despite there being no clinical basis for the services, had them undergo phony testing, and submit to purported therapy services that were experimental and

investigational, among other things, all solely to maximize profits without regard to genuine patient care.

63.     For example, at the Church Avenue Clinic, where Defendants purportedly performed more Fraudulent Services than at any other location, the treatment provided to the Insureds was overseen and directed by unlicensed persons who are not presently identifiable. These unidentifiable laypersons directed the Insureds' medical care pursuant to predetermined treatment protocols, without regard for medical necessity, and in a manner to maximize the amount of No-Fault Benefits that could be obtained from each Insured.

64.     As part of overseeing and directing the medical care of Insureds and other patients at the Church Ave Clinic, and as part of the unlawful kickback arrangement, the unidentifiable laypersons ordered the Clinic "representatives" to direct patients to the Defendants for the performance of Fraudulent Services, which were medically unnecessary and part of a predetermined fraudulent protocol.

65.     The Clinic "representatives" typically making the referrals were receptionists or some other non-medical personnel who simply directed or "steered" the Insureds to whichever practice was being given access to the Insureds on a given day pursuant to the unlawful payment and referral arrangement.

**C.     Defendants Place the Fraudulent Scheme In Motion**

66.     Once all the necessary "pieces" were in place and Kenworthy had ceded control to the Billing Defendants and John Doe Defendants, the fraud scheme was put into overdrive. The John Doe Defendants and Billing Defendants began to illegally operate and manage the Kenworthy Practices and implemented the fraudulent billing and treatment scheme using a "quick hit" strategy, billing GEICO and other New York automobile insurers millions of dollars for the performance of

the Fraudulent Services in a matter of months, thereby attempting to limit the insurance companies' ability to investigate and address the scheme.

67.     The Defendants "quick hit" scheme involved using both of the Kenworthy Practices in sequential order. Between June 9, 2021, and September 17, 2021, Kenworthy, the Billing Defendants, and the John Doe Defendants used the EK Sole Proprietorship to bill GEICO and other New York automobile insurers for Fraudulent Services purportedly performed on Insureds as a way to "test" the insurance industry to see whether they could obtain money from their fraudulent scheme before GEICO could investigate and address the scheme. During the three (3) month period between June 2021 and September 2021, the Defendants submitted 615 bills to GEICO involving 246 separate patients and sought more than $760,000.00 in reimbursement. As a direct result of the Defendants scheme, through the EK Sole Proprietorship, the Defendants fraudulently obtained more than $57,000.00 from GEICO.

68.     After the Defendants tested their fraudulent scheme using the EK Sole Proprietorship, they abandoned use of the original billing entity and used the EK MD Sole Proprietorship in its place.  Specifically, between October 18, 2021 and March 11, 2022, the Defendants billed GEICO approximately $470,000.00 for Fraudulent Services purportedly performed on Insureds. During this period, the Defendants, through the EK MD Sole Proprietorship, submitted more than 340 bills to GEICO involving approximately 75 separate patients.  The Defendants purposefully billed GEICO, and other automobile insurers, using the EK MD Sole Proprietorship at a lower volume than the EK Sole Proprietorship in order to obtain a higher percentage of quick reimbursement from automobile insurers. As a result, fraudulently obtained more than $108,000.00 from GEICO.

69.     As part of the scheme, the Billing Defendants and the John Doe Defendants arranged to have the account receivables associated with the GEICO billings for the Fraudulent Services "funded" through the Funders with the assistance of the collection lawyers and arranged for documents to be signed directing the payments to be made to them rather than Kenworthy.

70.     As a result of those efforts, the Billing Defendants and the John Doe Defendants received hundreds of thousands, if not millions, of dollars in advances on the claims for the Fraudulent Services from the Funders without any risk because they were never signatory to the agreements. In addition, the Billing Defendants and the John Doe Defendants had the collection lawyers begin billing GEICO and other New York automobile insurers for the Fraudulent Services.

71.     Through the funding and collection arrangement, the John Doe Defendants controlled the Kenworthy Practice and were able to realize an immediate financial benefit because they were paid a percentage on the face value of the billings submitted to GEICO for the Fraudulent Services. The collection lawyers (in turn) would be compensated through the payment of other monies from the insurance companies, including legal fees associated with the collections as well as interest and other charges to be repaid from the collections on the claims for the Fraudulent Services.

72.     An overwhelming majority of the claims was accompanied by a letter from the collection lawyers, falsely representing that they represented Kenworthy and the Kenworthy Practices in connection with the collection of charges from GEICO for the performance of the Fraudulent Services.

**D.     The Fraudulent Billing and Treatment Protocols Employed by The Defendants**

73.     The Fraudulent Services billed in the name of the Kenworthy Practices were not medically necessary and were provided, to the extent they were provided at all, pursuant to pre-

determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds. The Fraudulent Services were further provided pursuant to the dictates of unlicensed laypersons not permitted by law to render or control the provision of healthcare services.

74.     Neither Kenworthy nor any other licensed physicians were ever involved in the performance of the Fraudulent Services. In fact, unlicensed laypersons, rather than any healthcare professionals working in the Clinics, developed and controlled the patient base at the Clinics. Once they were given access, John Doe Defendants arranged to have Insureds at the Clinics subjected to the Fraudulent Services by unlicensed technicians that they controlled despite there being no clinical basis for the services and submit to purported therapy services that were experimental and investigational, among other things, all solely to maximize profits without regard to genuine patient care.

75.     In fact, there was no physician involvement with the performance of any of the Fraudulent Services, and the only point in having the Insureds seen by the unlicensed technicians was to get the patient's signature on a piece of paper so that the John Doe Defendants could get money from the Funders and transmit the claims to the collection lawyers so that they could generate bills and submit them to GEICO seeking payment for the Fraudulent Services to earn their compensation.

76.     Regardless of the nature of the accidents or the actual medical needs of the Insureds, the John Doe Defendants purported to subject virtually every Insured to a pre-determined fraudulent treatment protocol without regard for the Insureds' individual symptoms or presentment.

77.     Each step in the Defendants' fraudulent treatment protocol was designed to falsely reinforce the rationale for the previous step and provide a false justification for the subsequent step, and thereby permit the Defendants to generate and falsely justify the maximum amount of fraudulent no-fault billing for each Insured.

78.     No legitimate physician or other licensed healthcare provider would permit the fraudulent treatment and billing protocol described below to proceed under his or her auspices. This conclusion is reinforced by the fact that there was no physician involvement in any of the Fraudulent Services allegedly performed on Insureds and billed to GEICO.

### 1.     The Fraudulent Charges for "Extracorporeal Shockwave Therapy"

79.     The Defendants purported to systemically subject Insureds to medically unnecessary ESWT "treatments".  In keeping with the fact that the Defendants intended to conceal the absence of any physician involvement and that the Kenworthy Practices were just one of several billing entities that they used, the John Doe Defendants arranged to have the services documented on a generic "form" that typically did not include any reference to Kenworthy or either of the Kenworthy Practices.  To the extent that the generic forms reference Kenworthy's name, it would contain Kenworthy's name in a noticeably different font. The following are representative example:

RADIAL PRESSURE WAVE THERAPY REPORT

RPW Consult/Treatment Form

S: Pt is a ___ y/o 3/85 who sustained injuries in an accident on 4/2/21

O: Tenderness to palpation and/or decreased ROM

- [✓] Cervical
- [ ] Thoracic
- [ ] Lumbar
- [ ] Other: _____
- [ ] R. Shoulder
- [ ] L. Shoulder
- [ ] R. Knee
- [ ] L. Knee

TREATMENT GOALS

- [ ] Improve Mobility and ROM
- [ ] Improve Function/Activity Tolerance
- [ ] Increase General Fitness/Endurance
- [ ] Break Up Soft Tissue Adhesions
- [ ] Decrease Inflammation
- [ ] Decrease Pain
- [ ] Decrease Stiffness
- [ ] Other: _____

Frequency:
[ ] 0-1 times [ ] 1-2 times [ ] 2-3 times [ ] 3-4 times [ ] 4-5 times   a week

Parameters (technician use):
Pressure Intensity 1.4 BAR (1.0 to 10)
Pulses 1500 (500 to 3000)
Frequency 3 Hz (3 to 16)
Type of Transmitter [ ] (Red R40) [✓] (Black D20) [ ] (Other)

Date: 7, 11, 21

Extracorporeal Shockwave Therapy Notes

Date: 10/19/21   DOA 7, 9/21

Patient Name: _____

Patient Signature: _____

Initial Treatment:
Treatment 1:
Treatment 2:
Treatment 3:
Treatment 4:
Treatment 5:

0101T Extracorporeal Shockwave Procedures

Cervical Spine Regions Muscular Pain ___✓ 0101T
Thoracic Spine Regions Muscular Pain _____ 0101T
Lumbar Spine Regions Muscular Pain ___✓ 0101T
Shoulder ___ Left ___ Right ___ 0101T
Elbow ___ Left ___ Right ___ 0101T
Ankle ___ Left ___ Right ___ 0101T
Lower Leg ___ Left ___ Right ___ 0101T
Feet ___ Left ___ Right ___ 0101T
Knee ___ Left ___ Right ___ 0101T
Wrist ___ Left ___ Right ___ 0101T
Hip ___ Left ___ Right ___ 0101T
Upper Leg ___ Left ___ Right ___ 0101T

Total Number of Units ___ 2

Doctor's Signature: Eric Kenworthy MD

---

FIRST NAME _____ LAST NAME _____
PATIENT R

DOB 3/ /1985
DOB 3/ / 12
LOCATION: _____

Extracorporeal Shock Wave & RPW Treatment

Procedure #: [ ]1 [ ]2 [ ]3 [✓]4

- [ ] Cervical
- [ ]
- [ ]

DX Codes
- [ ] M54.2 Cervicalgia
- [ ] M54.6 Pain in Thoracic
- [ ] M54.5 Low Back Pain
- [ ] M54.41 Lumbago with Sciatica R side
- [ ] M54.42 Lumbago with Sciatica L side
- [ ] M25.561 Pain in right knee joint
- [ ] M25.562 Pain in left knee joint
- [ ] M25.511 Pain in right shoulder
- [ ] M25.512 Pain in left shoulder
- [ ] M79.604 Pain in right leg
- [ ] M79.605 Pain in left leg
- [ ] OTHER _____

14  21

Eric Kenworthy MD

RADIAL PRESSURE WAVE THERAPY REPORT

RPW Consult/Treatment Form

S: Pt is a 27 y/o F who sustained injuries in an accident on 5/18/21

O: Tenderness to palpation and/or decreased ROM

- [✓] Cervical
- [ ] Thoracic
- [ ] Lumbar
- [ ] Other: _____
- [✓] R. Shoulder
- [✓] L. Shoulder
- [ ] R. Knee
- [ ] L. Knee

TREATMENT GOALS

- [✓] Improve Mobility and ROM
- [✓] Improve Function/Activity Tolerance
- [ ] Increase General Fitness/Endurance
- [ ] Break Up Soft Tissue Adhesions
- [ ] Decrease Inflammation
- [✓] Decrease Pain
- [ ] Decrease Stiffness
- [ ] Other: _____

Frequency:
[✓] 0-1 times [ ] 1-2 times [ ] 2-3 times [ ] 3-4 times [ ] 4-5 times ( a week )

Parameters (technician use):
Pressure Intensity 10 BAR (1.0 to 10)
Pulses 3500 (500 to 3000)
Frequency 10 Hz (3 to 16)
Type of Transmitter [ ] (Red R40) [✓] (Black D20) [ ] (Other)

Date: 8/23/2021

Eric Kenworthy MD
License # 170513

80.     Of consequence, the claims submitted to GEICO by the Defendants with an NF-3 form that falsely represented that Kenworthy performed ESWT "treatments" included "reports" that virtually always contained either a printed signature for Kenworthy, or no signature at all. Neither the "notes" associated with the ESWT "treatments" nor the claims that were submitted to GEICO by the Defendants ever identified the technician who actually performed the service on the Insured.

81.     The billing data associated with the claims submissions made to GEICO corroborates the fraudulent nature of the billing/treatment protocols. According to the billing, the ESWT "treatment" alleged to have been performed on Insureds between June 9, 2021 and September 17, 2021 (approximately three months) and submitted through the EK Sole Proprietorship purported that: (i) approximately 480 separate ESWT services were performed; (ii) the ESWT services was performed on more than 220 separate patients; and (iii) the service was regularly performed at multiple locations on the same day.

82.     Similarly, the billing data associated with the claims submissions made to GEICO for ESWT "treatment" alleged to have been performed through the EK MD Sole Proprietorship also corroborates the fraudulent nature of the billing/treatment protocols. Between October 18, 2021 and March 11, 2022 (less than five months) purported that: (i) more than 340 separate dates of service were performed; (ii) the service was performed on approximately 75 separate patients; and (iii) the service was also regularly performed at multiple locations on the same day.

83.     Once documented by the unidentified technicians, the Defendants then billed GEICO for the performance of ESWT using the tax identifications under associated with the Kenworthy Practices using CPT code 0101T.

**CATEGORY III CODES**                                                                    **0042T–0504T**

**Medical Fee Schedule**                                                          **Effective April 1, 2019**

| | | Code | Description | Relative Value | FUD | PC/TC Split |
|---|---|---|---|---|---|---|
| ■ | | 0042T | Cerebral perfusion analysis using computed tomography with contrast administration, including post-processing of parametric maps with determination of cerebral blood flow, cerebral blood volume, and mean transit time | 15.44 | XXX | |
| ■ | + | 0054T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on fluoroscopic images (List separately in addition to code for primary procedure) | 2.47 | XXX | |
| ■ | + | 0055T | Computer-assisted musculoskeletal surgical navigational orthopedic procedure, with image-guidance based on CT/MRI images (List separately in addition to code for primary procedure) | 3.23 | XXX | |
| | | 0058T | Cryopreservation; reproductive tissue, ovarian | BR | XXX | |
| | | 0071T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume less than 200 cc of tissue | BR | XXX | |
| | | 0072T | Focused ultrasound ablation of uterine leiomyomata, including MR guidance; total leiomyomata volume greater or equal to 200 cc of tissue | BR | XXX | |
| ■ | | 0075T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; initial vessel | 18.68 | XXX | |
| ■ | + | 0076T | Transcatheter placement of extracranial vertebral artery stent(s), including radiologic supervision and interpretation, open or percutaneous; each additional vessel (List separately in addition to code for primary procedure) | 17.50 | XXX | |
| | | 0085T | Breath test for heart transplant rejection | BR | XXX | |
| | + | 0095T | Removal of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| | + | 0098T | Revision including replacement of total disc arthroplasty (artificial disc), anterior approach, each additional interspace, cervical (List separately in addition to code for primary procedure) | BR | XXX | |
| ■ | | 0100T | Placement of a subconjunctival retinal prosthesis receiver and pulse generator, and implantation of intra-ocular retinal electrode array, with vitrectomy | 16.22 | XXX | |
| ■ | | 0101T | Extracorporeal shock wave involving musculoskeletal system, not otherwise specified; high energy | 2.78 | XXX | |

84.     As noted, CPT code 0101T is listed in the Fee Schedule as a "temporary code" identifying emerging and experimental technology. Temporary codes may become permanent codes or deleted during updates of the code set. Additionally, and as noted in the Fee Schedule, the CPT code: (i) is scheduled to be paid using the conversion rate for surgical services; and (ii) does not distinguish between a professional component and technical component, thus confirming that the service need be performed by a licensed physician to be reimbursable.

85.     Furthermore, the ESWT treatment allegedly performed on Insureds was fraudulent because the service that was allegedly provided does not qualify for reimbursement under the CPT code for several independent reasons. In the first instance, the charges were fraudulent in that the unlicensed technicians controlled by the John Doe Defendants did not even actually provide ESWT or any service that satisfied the requirements of CPT code 0101T. Rather, the John Doe Defendants arranged to have the unlicensed technicians perform Radial Pressure Wave Therapy

on the Insureds. Radial Pressure Wave Therapy involves the low energy delivery of compressed air and is incapable of generating a true shock wave. Radial Pressure Wave Therapy does not satisfy the requirements of CPT code 0101T, which requires "high energy" shockwave.

86.     Second, the charges were fraudulent because the use of ESWT for the treatment of back, neck, and shoulder pain is experimental and investigational in nature.  In fact, and in keeping with that characterization: (i) the use of ESWT has not been approved by the US Food and Drug Administration ("FDA") for the treatment of back, neck, or shoulder pain; (ii) there are no legitimate peer reviewed studies that establish the effectiveness of ESWT for the treatment of back, neck, or shoulder pain; and (iii) the Centers for Medicare & Medicaid Services has published coverage guidance for ESWT stating that further research is needed to establish the efficacy and safety of ESWT in the treatment of musculoskeletal conditions; that there is uncertainty associated with this intervention; and it not reasonable and necessary for the treatment of musculoskeletal conditions and therefore not covered.

87.     Notwithstanding the experimental nature, the Defendants purportedly provided ESWT as part of a pre-determined fraudulent protocol to virtually every Insured, without regard to each Insured's individual complaints, symptoms, or presentation. In furtherance of that, the Defendants typically submitted a boilerplate, checklist treatment report that either contained a printed signature, or did not contain any signature, and the ESWT was provided to Insureds soon after their accident without giving the patients the opportunity to sufficiently respond to conservative therapies.

88.     For example, the Defendants typically rendered ESWT to Insureds less than twenty (20) days after the accidents, including the following examples:

(i)     Defendants purported to provide ESWT through the EK MD Sole Proprietorship to an Insured named NA on November 18, 2021, only three days after the Insured's accident on November 15, 2021.

(ii)    Defendants purported to provide ESWT through the EK MD Sole Proprietorship to an Insured named HBJ on November 16, 2021, only four days after the Insured's accident on November 12, 2021.

(iii)   Defendants purported to provide ESWT through the EK MD Sole Proprietorship to an Insured named RS on October 21, 2021, only five days after the Insured's accident on October 16, 2021.

(iv)    Defendants purported to provide ESWT through the EK Sole Proprietorship to an Insured named JM on June 29, 2021, only six days after the Insured's accident on June 23, 2021.

(v)     Defendants purported to provide ESWT through the EK MD Sole Proprietorship to an Insured named Phylicia Gibson on October 19, 2021, only seven days after the Insured's accident on October 12, 2021.

(vi)    Defendants purported to provide ESWT through the EK MD Sole Proprietorship to an Insured named SB on November 16, 2021, only seven days after the Insured's accident on November 9, 2021.

(vii)   Defendants purported to provide ESWT through the EK Sole Proprietorship to an Insured named RF on July 8, 2021, only nine days after the Insured's accident on June 29, 2021.

(viii)  Defendants purported to provide ESWT through the EK Sole Proprietorship to an Insured named EPM on July 14, 2021, only ten days after the Insured's accident on July 4, 2021.

(ix)    Defendants purported to provide ESWT through the EK Sole Proprietorship to an Insured named KJ on July 16, 2021, only ten days after the Insured's accident on July 6, 2021.

(x)     Defendants purported to provide ESWT through the EK Sole Proprietorship to an Insured named WM on July 5, 2021, only eleven days after the Insured's accident on June 24, 2021.

89.     These are only representative examples. Additionally, the Defendants routinely provided ESWT to multiple Insureds involved in the same accident from the same Clinics. For example:

(i)     On March 14, 2021, three Insureds – CG, LG, and ZW – were involved in the same automobile accident. Thereafter, CG, LG and ZW all presented to the Church Avenue Clinic, and each purportedly received ESWT "treatments" from the EK Sole Proprietorship.

(ii)    On April 21, 2021, two Insureds – RE and TF– were involved in the same automobile accident. Thereafter, RE and TF both presented to the East Merrick Road Clinic, and each purportedly received ESWT "treatments" from the EK Sole Proprietorship.

(iii)   On May 11, 2021, two Insureds – PH and VM – were involved in the same automobile accident. Thereafter, PH and VM both presented to the Clinic located at the Eastchester Road Clinic, and each purportedly received ESWT "treatments" from the EK Sole Proprietorship.

(iv)    On July 5, 2021, two Insureds – ME and NR – were involved in the same automobile accident. Thereafter, ME and NR both presented to the Clinic located at 1655 Richmond Highway, Staten Island, New York, and each purportedly received ESWT "treatments" from the EK Sole Proprietorship.

(v)     On August 2, 2021, two Insureds – KF and NM– were involved in the automobile accident. Thereafter, KF and NM both presented to the Clinic located the White Plains Road Clinic, and each purportedly received ESWT "treatments" from the EK Sole Proprietorship.

(vi)    On September 9, 2021, two Insureds – TB and SN – were involved in the same automobile accident. Thereafter, TB and SN both presented to the Clinic located at 282 Avenue X, Brooklyn, New York and each purportedly received ESWT "treatments" from the EK Sole Proprietorship.

(vii)   On September 20, 2021, four Insureds – LB, JB, ME, and MP– were involved in the same automobile accident. Thereafter, LB, JB, ME, and MP all presented to the Coney Island Avenue Clinic, and each purportedly received ESWT "treatments" from the EK MD Sole Proprietorship.

(viii)  On September 25, 2021, three Insureds – FM, KM and NM – were involved in the same automobile accident. Thereafter, FM, KM, and NM all presented to the Morris Park Avenue Clinic, and each purportedly received ESWT "treatments" from the EK Sole Proprietorship.

(ix)    On December 31, 2021, two Insureds – AL and JY– were involved in the same automobile accident. Thereafter, AL and JY both presented to the Clinic located at 9046 Corona Avenue, Queens, New York, and each purportedly received ESWT "treatments" from the EK MD Sole Proprietorship.

(x)     On January 3, 2022, two Insureds – JB and FC – were involved in the same automobile accident. Thereafter, JB and FP both presented to the North Main Street Clinic, and each purportedly received ESWT "treatments" from the EK MD Sole Proprietorship.

(xi)    On February 3, 2022, two Insureds – JM and AJ – were involved in the same automobile accident. Thereafter, JM and AT both presented to the Clinic located at 6642 Myrtle Avenue, Queens, New York, and each purportedly received ESWT "treatments" from the EK MD Sole Proprietorship.

90.     These are only representative samples. In all of the claims identified in Exhibit "1" for ESWT, the Defendants falsely represented that the ESWT "treatments" were medically necessary, when in fact they were not medically necessary for each Insured, were pursuant to predetermined fraudulent protocols, and were therefore not eligible to collect No-Fault Benefits in the first instance.

91.     In addition to the billing for ESWT being fraudulent for the reasons described above, the charges were also fraudulent because the bills misrepresented the amounts collectible for each date of service.  More specifically, CPT Code 0101T only contemplates the billing for the code once per date of service. The code specifically describes the service as pertaining to the "musculoskeletal system", not a patient's individual limb or spine/trunk sections.

92.     Notwithstanding the clear language of the code, the bills fraudulently unbundled the service in the billing that was prepared and submitted by duplicating the code multiple times (and increasing the corresponding charges) for each section of the Insured's body to which the ESWT was performed.

93.     Initially as part of the fraudulent scheme, the Defendants would frequently bill for 2 or 3 units for each date of service through the EK Sole Proprietorship. However, when the Defendants changed tactics and started billing GEICO through the EK MD Sole Proprietorship, the Defendants virtually always billed for 2 units for each date of service.

94. The following is a representative example of the bills submitted from each of the Kenworthy Practices:

### The EK Sole Proprietorship

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| Date of Service | Place of Service Including Zip Code | Description of Treatment or Health Service Rendered | Unit | Fee Schedule Treatment Code | Charges |
|---|---|---|---|---|---|
| 08/09/2021 | 3910 Church Ave, Brooklyn, NY, 11203 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE LUMBAR AREA | 1 | 0101T | $ 700 39 |
| 08/09/2021 | 3910 Church Ave, Brooklyn, NY, 11203 | EXTRACORPOREAL SHOCK WAVE & RADIAL PRESSURE WAVE RIGHT HIP | 1 | 0101T | $ 700 39 |

**TOTAL CHARGES TO DATE $ 1400 78**

### The EK MD Sole Proprietorship

**15. REPORT OF SERVICES RENDERED -- ATTACH ADDITIONAL SHEETS IF NECESSARY**

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | FEE SCHEDULE TREATMENT CODE | CHARGES |
|---|---|---|---|---|
| 01/04/22 | 14 NORTH MAIN STREET Spring Valley NY 10977 | SHOCKWAVE THERAPY C/SP | 0101T | 700.39 |
| 01/04/22 | 14 NORTH MAIN STREET Spring Valley NY 10977 | SHOCKWAVE THERAPY L/SP | 0101T | 700 39 |

**TOTAL CHARGES TO DATE$ $ 1400.78**

95. In doing so, the Defendants artificially and fraudulently increased the amount of reimbursement to which they would be entitled by two (2) or three (3) times for each date of services.

96. In all of the claims identified in Exhibit "1" for ESWT testing, the Defendants falsely represented that the ESWT charges were medically necessary, were performed by Kenworthy, and were appropriately charged, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols, were inappropriately unbundled, and were therefore not eligible to collect No-Fault Benefits in the first instance.

### 2.    The Fraudulent Billing Under CPT Code 97799

97.     In addition to the medically unnecessary ESWT "treatments", the Defendants, through the EK Sole Proprietorship, frequently submitted claims to GEICO for purporting to provide Insureds with medically unnecessary and non-reimbursable "Activity Limitation Measurement" treatments using the CPT Code 97799 for with a charge of $475.00.

98.     As noted above, the October 2020 changes to the Fee Schedule eliminated reimbursement for services for multiple services, including: (i) physical performance testing (e.g. CPT Code 97750), (ii) range of motion testing (e.g. CPT Code 95851) and manual muscle testing (e.g. CPT Code 95831) because they had historically been subject to abuse.

99.     Neither the Fee Schedule nor the American Medical Association's CPT Guide include a designated code or definition for activity limitation measurement because that "service" or "diagnostic" does not actually exist.  The measurement of a patient's limitation are either (i) part of the evaluation and management services provided by the treating physician and billed using appropriate CPT codes (e.g. 99211-99215), or when billed independently, fall within codes for which no reimbursement is provided (e.g. 97750, 98531, 95851) because the relative value (the "RVU") is "0".   In an effort to seek reimbursement where none is provided, the Defendants fraudulently characterized the services in the billing submitted to GEICO using CPT Code 97799, which is a "BR" or By Report Code.

100.    In keeping with the fact that the "activity limitation measurements" billed to GEICO using CPT Code 97799 were medically unnecessary and part of the Defendants scheme to submit billing to GEICO solely to maximize the amount of money they could obtain, the "activity limitation measurements" purportedly performed on the Insureds did not provide any diagnosis and was not used to further the treatment of the Insureds' conditions.

101.   For example, according to the medical reports for the "activity limitation measurements" included in the bills submitted by the Defendants to GEICO, the measurements involved several strength tests that purportedly were performed on the Insureds. The medical reports identified the different strength tests performed on the Insureds but did not include any diagnoses, summary, conclusions, treatment recommendations, or any analysis of the purported strength tests performed on the Insureds. of the Insureds provide any medical benefit.

102.   In further keeping with the fact that the services were medically unnecessary, and similar to the ESWT "treatments" purportedly provided through the EK Sole Proprietorship, the activity limitation measurements billed using CPT Code 97799 were not performed by Kenworthy. Instead, to the extent they were actually performed, the measurements were performed by unlicensed technicians that were not under the supervision of Kenworthy or another licensed physician employed by the EK Sole Proprietorship.

103.   However, each of the claims submitted to GEICO by the Defendants with an NF-3 form that falsely represented that Kenworthy performed activity limitation measurements.

104.   The Defendants intended to fraudulently misrepresent that the activity limitation measurements were performed by Kenworthy when they were actually performed by unlicensed technicians by including a photocopy or stamp of Kenworthy's signature on the last page of each medical report associated with the activity limitation measurement charges.

105.   Neither the medical reports nor the claims that were submitted to GEICO by the Defendants ever identified the technician who actually performed the activity limitation measurements on the Insureds.  Also, and in keeping with the fact that the activity limitation measurements were medically unnecessary and provided solely to maximize the amount of benefits that the Defendants could obtain from GEICO and other automobile insurers, each of the

bills to GEICO for activity limitation measurements were accompanied by a boilerplate form purportedly explaining the need for the activity limitation measurements on the Insureds and containing a photocopied or stamped signature by Kenworthy.

106.     The following is an example of the boilerplate form that the Defendants submitted to GEICO:



*Activity Limitation Measurement and Training Report (billed as 97799)*

Patient Name

DOA   6/4/20

*Activity limitations are difficulties an individual may have in the performance of daily activities - both at work and domestically. Such limitations must be actually observable, and are rated regardless of capacity or aptitude. Several additions and qualifiers to activity limitations are: activity limitations involve the integrated use of body functions at the individual level, activity limitations involve qualitative or quantitative alterations in the way an activity is performed in relation to reduce or eliminate an activity limitation, though an underlying impairment (of body function or structure) if applicable.*

*Purpose of activity limitation test is to accurately determine individual's ability to perform meaningful tasks safely and dependably. It is based on objective performance measurements that are analyzed and recorded by state of the art computer technology. It is not an observation or subjective determination of an individual's self report of abilities.*
Results of the test will serve three valuable purposes:

*1.   Test will identify functional weakness and strength deficits, allowing for proper treatment and rehabilitation*

*2.   Test aids in establishing an impartial and objective measurement of the patient's capabilities, daily activities and work - limitations, necessary for judicial resolution, disability determination and treatment progress determination*

*3.   Test provides the patient with objective and quantifiable limitations he/she faces as a result of the injury establishing safe activity limits and training are aimed at determination of limitation and outlining the precautions to be taken not to aggravate the injury.*

*The patient was tested using JTech computerized evaluation system. Coefficient of Variation and difference between successive of 14 % or less indicates validity, reproducibility and consistency of effort.*

*Depending on the level of patient's compliance, the examination takes 40-55 minutes.*

*In addition to testing patient received a comprehensive training as to how to deal with the limitation in both work and home environments. Patient received written and verbal instructions as how to avoid aggravating the injury and what steps need to be taken outside of formal medical setting in order to facilitate recovery.*

*After extensive review of the Worker's Compensation Fee Schedule, the only proper CPT code to be used to bill for the procedure is 97799. Activity Limitation Measurement and training is a combination of both testing patient's physical abilities and limitations, but also it integrates a training component which provides the patient with necessary tools to deal with the said limitations and to prevent aggravation of the injury. There is no code in the fee schedule which would reflect the abovementioned components.*

*To determine the value of a "RR" code, one must review the Instructions for unlisted codes under General Ground Rule 2 and 3. In order to consider a proper amount to be billed, we considered the following codes that do have specific RUV listed in the Fee schedule.*

*97750 - Physical Performance Testing- each 15 minutes- 5.41*
*97545 - Work hardening/conditioning - 28.00*



97800- Functional capacity evaluation - $500

In comparing the codes, activity limitation measurement and training is most similar to Functional capacity evaluation  However, It may not be billed under 97800 since ALM&T has a wilder purpose and application than Functional capacity evaluation  FCE only evaluates patients Limitation as they apply in determination of work limitation and ALM&T also includes evaluation of any restrictions patient may have in day to day activities. In addition, FCE does not have the training component, present in ALM&T. Presence of training component is not simply an addition of unrelated procedure. Training is an extension of the testing and is an integral and necessary part of ALM& T evaluation. Therefore, ALM& T should have a greater RUV than Functional Capacity evaluation.

In addition to looking at the RVU of similar codes, we also looked at the amounts charged for this procedure by other medical professionals in our geographic area. According to review of recent American Arbitration Association awards and NY Civil Court decisions, we determined that the Overwhelming majority of the providers are charging $475 for performing ALM&T.

After taking in consideration both value of Functional Capacity evaluation and other similar codes, and the prevailing rate charged by the providers in our geographic area, we determined that the proper amount to bill for this procedure is $475.

Providers signature _____     Date __7|6|2021__

I, _____ participated in an activity limitation measurement and training and received written and verbal information in regards to the test results as well as training on the daily activities and work limitations."

Patient signature _____     Date __7|6|202/__

107.   Of consequence, and contrary to the language in the above-described letter explaining the need for the measurement testing, the medical reports associated with the purported measurement tests never actually provided a conclusion, diagnosis, summary, or analysis regarding the Insureds': (i) function weakness and strength deficits; (ii) daily activity and work limitations; and (iii) safe activity limits.

108.   In keeping with the fact that the activity limitation measurement tests were medically unnecessary, if the tests were actually performed, they were performed pursuant to a pre-determined treatment protocol, not because any Insured actually needed the tests based upon his or her individual circumstances.

109.    Like the ESWT, the "activity limitation measurement" tests were not meant to impact any Insured's course of treatment. Rather, the "activity limitation measurement" tests were performed as part of the Defendants' pre-determined fraudulent billing and treatment protocols, designed to financially enrich the Defendants at the expense of GEICO, rather than to treat or benefit the Insureds who were subjected to them.

110.    In keeping with the fact that the charges to GEICO using CPT Code 97799 from the EK Sole Proprietorship were medically unnecessary and issued pursuant to a pre-determined protocol, many of the Insureds who were purportedly provided with multiple activity limitation measurement tests.

111.    For example:

(i)     On April 7, 2021, an Insured named CO was involved in a motor vehicle accident. Thereafter, CO received treatment at the Church Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) June 30, 2021; (ii) August 2, 2021; and (iii) September 1, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on CO.

(ii)    On April 21, 2021, an Insured named GL was involved in a motor vehicle accident. Thereafter, GL received treatment at the Church Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) June 29, 2021; (ii) August 2, 2021; and (iii) September 1, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on GL.

(iii)   On May 31, 2021, an Insured named RG was involved in a motor vehicle accident. Thereafter, RG received treatment at the Church Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) June 29, 2021; (ii) July 30, 2021; and (iii) September 8, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on RG.

(iv)    On June 3, 2021, an Insured named TC was involved in a motor vehicle accident. Thereafter, TC received treatment at the Morris Park Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) July 2, 2021; and (ii) August 5, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on TC.

(v)     On June 12, 2021, an Insured named RB was involved in a motor vehicle accident. Thereafter, RB received treatment at the Church Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) June 29, 2021; (ii) July 30, 2021; and (iii) September 1, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on RB.

(vi)    On June 13, 2021, an Insured named AB was involved in a motor vehicle accident. Thereafter, AB received treatment at the Church Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) June 30, 2021; (ii) July 30, 2021; and (iii) September 8, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on AB.

(vii)   On June 22, 2021, an Insured named IS was involved in a motor vehicle accident. Thereafter, IS received treatment at the Morris Park Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) July 2, 2021; and (ii) August 5, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on IS.

(viii)  On June 25, 2021, an Insured named RO was involved in a motor vehicle accident. Thereafter, RO received treatment at the Morris Park Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) July 7, 2021; and (ii) August 5, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on RO.

(ix)    On September 28, 2020, an Insured named TQ was involved in a motor vehicle accident. Thereafter, TQ received treatment at the Morris Park Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) July 2, 2021; and (ii) August 12, 2021. For each date, the EK Sole Proprietorship charged

GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on TQ.

(x)     On August 16, 2021, an Insured named JF was involved in a motor vehicle accident. Thereafter, JF received treatment at the Morris Park Avenue Clinic and purported to receive activity limitation measurement testing by Kenworthy and the EK Sole Proprietorship on: (i) August 24, 2021; and (ii) September 14, 2021. For each date, the EK Sole Proprietorship charged GEICO $475.00, using CPT Code 97799, and claimed that Kenworthy performed the activity limitation measurement on JF.

112.    These are only representative examples. Additionally, on numerous occasions, multiple Insureds who were involved in the same automobile accident and presented to the same Clinic purportedly received the same activity limitation measurement. For example:

(i)     On March 26, 2021, two Insureds – LA and HD – were involved in the same motor vehicle accident. Thereafter, LA and HD both presented to the Church Avenue Clinic, and each purportedly received activity limitation measurement testing from the EK Sole Proprietorship that the Defendants billed to GEICO using CPT Code 97799.

(ii)    On May 12, 2021, two Insureds – RB and CP – were involved in the same motor vehicle accident. Thereafter, RB and CP both presented to the Church Avenue Clinic, and each purportedly received activity limitation measurement testing from the EK Sole Proprietorship that the Defendants billed to GEICO using CPT Code 97799.

(iii)   On June 25, 2021, two Insureds – MO and RO – were involved in the same motor vehicle accident. Thereafter MO and RO both presented to the Morris Park Avenue Clinic, and each purportedly received activity limitation measurement testing from the EK Sole Proprietorship that the Defendants billed to GEICO using CPT Code 97799.

(iv)    On June 29, 2021, two Insureds – JB and RF – were involved in the same motor vehicle accident. Thereafter, JB and RF both presented to the Church Avenue Clinic, and each purportedly received activity limitation measurement testing from the EK Sole Proprietorship that the Defendants billed to GEICO using CPT Code 97799.

(v)     On August 16, 2021, four Insureds – JF, AT, GT, and VT - were involved in the same motor vehicle accident. Thereafter, JF, AT, GT and VT all presented to the Morris Park Avenue Clinic, and each purportedly received activity limitation measurement testing from the EK Sole Proprietorship that the Defendants billed to GEICO using CPT Code 97799.

113.    These are only representative examples. In all the claims identified in Exhibit "1", the Defendants falsely represented that Fraudulent Services were medically necessary, when in fact they were not medically necessary for each Insured and provided pursuant to predetermined fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

114.    In all of the claims identified in Exhibit "1" using CPT Code 97799, the Defendants falsely represented that the charges were medically necessary and were performed by Kenworthy, when in fact they were not medically necessary for each Insured, were conducted by unlicensed technicians pursuant to predetermined fraudulent protocols and were therefore not eligible to collect No-Fault Benefits in the first instance.

**E.    The Fraudulent Billing for Independent Contractor Services**

115.    The Defendants fraudulent scheme also included the submission of claims to GEICO using the Kenworthy Practices seeking payment for services provided by individuals that the Kenworthy Practices never employed.

116.    Under the New York no-fault insurance laws, billing entities (including sole proprietorships) are ineligible to bill for or receive payment for goods or services provided by independent contractors. The healthcare services must be provided by the billing provider itself, or by its employees.

117.    Since 2001, the New York State Insurance Department consistently has reaffirmed its longstanding position that billing entities are not entitled to receive reimbursement under the New York no-fault insurance laws for healthcare providers performing services as independent contractors. See DOI Opinion Letter, February 21, 2001 ("where the health services are performed by a provider who is an independent contractor with the PC and is not an employee under the direct

supervision of a PC owner, the PC is not authorized to bill under No-Fault as a licensed provider of those services");  DOI Opinion Letter, February 5, 2002 (refusing to modify position set forth in 2-21-01 Opinion letter despite a request from the New York State Medical Society); DOI Opinion Letter, March 11, 2002 ("If the physician has contracted with the PC as an independent contractor, and is not an employee or shareholder of the PC, such physician may not represent himself or herself as an employee of the PC eligible to bill for health services rendered on behalf of the PC, under the New York Comprehensive Motor Vehicle Insurance Reparations Act…"); DOI Opinion Letter, October 29, 2003 (extending the independent contractor rule to hospitals).

118.    From June 2021 through March 2022, more than 950 separate bills were sent using the United States mails seeking payment for the Fraudulent Services purportedly performed by individuals other than Kenworthy, while falsely representing in every bill that Kenworthy was the provider of the service in question.

119.    This was done intentionally and to avoid the possibility that insurance companies such as GEICO would deny the bill if an accurate representation had been made regarding who actually performed the services and their relationship to the billing provider, which was billing unlawfully operated and controlled by the John Doe Defendants and the Billing Defendants.

120.    In fact, virtually every NF-3 form that was submitted to GEICO appeared as follows:

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
PAGE 3

| 16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING: | | | | | |
|---|---|---|---|---|---|
| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION NO. | BUSINESS RELATIONSHIP CHECK APPLICABLE BOX | | |
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Eric W Kenworthy | MD | Lic # 170513 | No | | |
| | | | | | |
| | | | | | |
| | | | | | |

121.     The statements in each of the NF-3 forms were false and fraudulent in that the unlicensed technicians who performed the Fraudulent Services were never: (i) employed by the Kenworthy or either of the Kenworthy Practices; and (ii) under Kenworthy's direction and/or control.

122.     In fact, the unlicensed technicians were performing services for multiple other "providers" being operated and controlled by the John Doe Defendants at the same time, and were paid without regard to the physician's name or entity through whom the Fraudulent Services were billed.

123.     In keeping with the fact that the unlicensed technicians performed the Fraudulent Services under the operation and control by the John Doe Defendants, without regard to the physician's name or entity that billed for the Fraudulent Services, virtually all of the Insureds identified in Exhibit "1" received ESWT from various providers, including one of the Kenworthy Practices, at a single Clinic.

124.     For example:

(i)      An Insured named NS was involved in an automobile accident on November 18, 2020. Thereafter, NS presented to the Morris Park Avenue Clinic, where he purportedly received ESWT from the Kenworthy Practice by Kenworthy. NS also purportedly received ESWT at the Morris Park Avenue Clinic from: (i) Emmons Avenue Medical Office, PC ("Emmons") by Ruben Oganesov, M.D. ("Oganesov"); (ii) MJG Medical Services, P.C.

("MJG") by Max Jean-Gilles, M.D. ("Jean-Gilles"); and (iii) CVAP Medical, PC ("CVAP") by Crystal Antoine Pepeljugoski ("Pepeljugoski").

(ii)   An Insured named EF was involved in an automobile accident on March 7, 2021. Thereafter, EF presented to the Clinic located at 647 Bryant Avenue, Bronx, New York (the "Bryant Avenue Clinic"), where he purportedly received ESWT from the Kenworthy Practice by Kenworthy. EF also purportedly received ESWT at the Bryant Avenue Clinic from: (i) Emmons by Oganesov; (ii) CVAP by Pepeljugoski; (iii) Community Medical Care of NY, PC by Ahmad Riaz, M.D.; (iv) Healthwise Medical Associates, PC by Dominic Onyema, M.D.; and (v) Headlam Medical Professional Corporation by Bo Tyler Headlam, M.D.

(iii)   An Insured named DJ was involved in an automobile accident on May 24, 2021. Thereafter DL presented to the Church Avenue Clinic, where he purportedly received ESWT from the Kenworthy Practice by Kenworthy. DL also purportedly received ESWT at the Church Avenue Clinic from: (i) MJG from Jean-Gilles; (ii) Mark H. Vine, M.D.; (iii) Grace Medical Health Provider, PC by Opeoluwa Eleyinafe, M.D.; and (iv) Olbusola Brimmo, M.D. ("Brimmo").

(iv)   An Insured named JB was involved in an automobile accident on September 20, 2021. Thereafter, JB presented to the Coney Island Avenue Clinic, where she purportedly received ESWT from the Kenworthy Practice by Kenworthy. JB also purportedly received ESWT at the Coney Island Clinic from: (i) Big Apple Medical Services, P.C. by Andrew Davy, M.D.; (ii) Harvey Levitan, M.D.; (iii) Sherrie Rawlins Medical P.C. by Sherrie Ann Rawlins, M.D.; and (iv) Brimmo.

(v)   An Insured named RP was involved in an automobile accident on February 18, 2022. Thereafter, RP presented to the North Main Street Clinic, where he purportedly received ESWT from the Kenworthy Practice by Kenworthy. AP also purportedly received ESWT at the North Main Street Clinic from Maxine Coles Services by Maxine Coles, M.D.

125.   These are only representative samples. In further keeping with the fact that the unlicensed technicians performed the Fraudulent Services under the operation and control by the John Doe Defendants, without regard to the physician's name or entity that billed for the Fraudulent Services, the form "medical notes" submitted by the Kenworthy Practices to GEICO were virtually identical to other form "medical notes" submitted to GEICO by other "providers".

126.   The following are representative examples of the form "medical notes" for the same Insured submitted by the Kenworthy Practices and Big Apple, respectively:



The Kenworthy Practices / Big Apple Medical Services, P.C.

127.   The fact that the unlicensed technicians performed the Fraudulent Services under the operation and control by the John Doe Defendants, without regard to the physician's name or entity that billed for the Fraudulent Services is evidenced further through the John Doe Defendants' submission of notes with Kenworthy's name printed in the bill for services purportedly provided by Harvery Levitan, M.D. to the Insured named Jeudy Berthony.

128.   The examples are shown below:

NEW YORK MOTOR VEHICLE NO-FAULT INSURANCE LAW
VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE
(This form us not for verification of hospital treatment)

| NAME AND ADDRESS OF INSURER OR SELF-INSURER | NAME, ADDRESS, AND PHONE NUMBER OF INSURER'S CLAIMS REPRESENTATIVE |
|---|---|
| GEICO Ins Co PO BOX 9607 Fredericksburg VA 22403 | |

| DATE 01/31/2022 | POLICYHOLDER | POLICY NUMBER | ACCIDENT DATE 09/20/2021 | CLAIM NUMBER |
|---|---|---|---|---|

PROVIDER'S NAME AND ADDRESS

Harvey Levitan, MD
C/O The Law Offices of John Gallagher, PLLC
9767 3rd Ave 2 Fl
Brooklyn, NY 11209-7751
Phone: 718-965-8908 Fax:

KINDLY COMPLETE AND SUBMIT THIS FORM AS SOON AS POSSIBLE. PLEASE NOTE, THIS COMPLETED FORM MUST BE SUBMITTED TO THE INSURER AS SOON AS REASONABLY POSSIBLE, BUT NO LATER THAN 45 DAYS OR 180 DAYS AFTER THE TREATMENT DATE, DEPENDING UPON THE POLICY ENDORSEMENT IN EFFECT AT THE TIME OF THE ACCIDENT.
IF YOU ARE UNSURE OF THE APPLICABLE TIME REQUIREMENT, KINDLY CONTACT THE CLAIMS REPRESENTATIVE TO DETERMINE WHICH DEADLINE IS APPLICABLE TO THIS CLAIM

IF YOU HAVE PREVIOUSLY SUBMITTED AN EARLIER REPORT ON THIS ACCIDENT, YOU NEED ONLY NOTE ANY CHANGES FROM THE INFORMATION PREVIOUSLY FURNISHED AND ADDITIONAL CHARGES.

4. PATIENT'S NAME | PATIENT'S ADDRESS

M

5. DIAGNOSIS AND CONCURRENT CONDITIONS
1. M54.5 – LOW BACK PAIN
2. M25.511 – PAIN IN RIGHT SHOULDER
3.

6. WHEN DID SYMPTOMS FIRST APPEAR? 09/20/2021
7. WHEN DID PATIENT FIRST CONSULT YOU FOR THIS CONDITION?

8. HAS PATIENT EVER HAD SAME OR SIMILAR CONDITION?
Yes___ No___ IF Yes, state when and describe:

9. IS CONDITION SOLELY A RESULT OF THIS AUTOMOBILE ACCIDENT?
Yes X No___ IF No, explain:

10. IS CONDITION DUE TO INJURY ARISING OUT OF PATIENT'S EMPLOYMENT?
Yes___ No X

11. WILL INJURY RESULT IN SIGNIFICANT DISFIGUREMENT OR PERMANENT DISABILITY?
Yes___ No___ NOT DETERMINABLE AT THIS TIME X
IF Yes, describe:

12. PATIENT WAS DISABLED (UNABLE TO WORK)
From:___ Through:___
13 IF STILL DISABLED THE PATIENT SHOULD BE ABLE TO RETURN TO WORK ON
Date:

---

VERIFICATION OF TREATMENT BY ATTENDING PHYSICIAN OR OTHER PROVIDER OF HEALTH SERVICE

14. WILL THE PATIENT REQUIRE REHABILITATION AND/OR OCCUPATIONAL THERAPY AS A RESULT OF THE INJURIES SUSTAINED IN THIS ACCIDENT?
Yes___ No___ IF YES, describe your recommendation below:

15. REPORT OF SERVICES RENDERED – ATTACH ADDITIONAL SHEETS IF NECESSARY

| DATE OF SERVICE | PLACE OF SERVICE INCLUDING ZIP CODE | DESCRIPTION OF TREATMENT OR HEALTH SERVICE RENDERED | MAI IV | FEE SCHEDULE TREATMENT CODE | CHARGES SUMMARY |
|---|---|---|---|---|---|
| 01/10/2022 | 1122 Coney Island Ave Suite 207 Brooklyn, NY 11230 | Extracorporeal shockwave treatment - RT Shoulder | | 0197T | $765.39 |
| 01/10/2022 | 1122 Coney Island Ave Suite 207 Brooklyn, NY 11230 | Extracorporeal shockwave treatment - Lumbar | | 0197T | $750.39 |
| | | | | TOTAL CHARGES TO DATE: | $1430.78 |

16. IF TREATING PROVIDER IS DIFFERENT THAN BILLING PROVIDER COMPLETE THE FOLLOWING:

| TREATING PROVIDER'S NAME | TITLE | LICENSE OR CERTIFICATION | BUSINESS RELATIONSHIP (check applicable box) | | |
|---|---|---|---|---|---|
| | | | EMPLOYEE | INDEPENDENT CONTRACTOR | OTHER (SPECIFY) |
| Harvey Levitan | MD | 156639 | | | Owner |

17. IF THE PROVIDER OF SERVICE IS A PROFESSIONAL SERVICE CORPORATION OR DOING BUSINESS UNDER AN ASSUMED NAME (DBA), LIST THE OWNER AND PROFESSIONAL LICENSING CREDENTIALS OF ALL OWNERS (Provide an additional attachment if necessary).

President: Harvey Levitan                     LIC # 156639

18. IF PATIENT STILL UNDER YOUR CARE FOR THIS CONDITION?     YES___     NO___

19. ESTIMATED DURATION OF FUTURE TREATMENT

PATIENT: Your health provider may agree to accept payment for health services performed directly from your Insurer ( Authorization to Pay Benefits ) so that you are not required to make payment to the health provider at the time of service. Such agreement is optional on the part of the health provider and must be signed by both patient and health provider. You may use the optional authorization language provided below, by checking off the designated spot in Item 20 of this form.

20.___ IF YOU HAVE CHOSEN TO AUTHORIZE THE DIRECT PAYMENT OF BENEFITS BY CHECKING THIS OPTION, YOU MAY NOT ALSO ENTER INTO AN ASSIGNMENT OF BENEFITS CONTAINED IN #21

AUTHORIZATION TO PAY BENEFITS:
I AUTHORIZE PAYMENT OF HEALTH BENEFITS TO THE UNDERSIGNED HEALTH CARE PROVIDER OR SUPPLIER OF SERVICES DESCRIBED BELOW. I RETAIN ALL RIGHTS, PRIVILEGES AND REMEDIES TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT PROVISIONS) OF THE INSURANCE LAW.

PATIENT NAME___     SIGNATURE___     DATE___

PATIENT: Your health provider may agree to have you assign your right to No-Fault benefits from your insurer directly to your health provider (Assignment of Benefits). If you and your health provider agree to an assignment of benefits, you must both sign the agreement contained in Item 21 or the prescribed AP-AOB form or as equivalent. The language contained in the Assignment of benefits is mandatory and may not be altered or amended by any other language added to this agreement or other written agreement.

21.___ X___ IF YOU HAVE CHOSEN TO ASSIGN YOUR BENEFITS TO THE HEALTH PROVIDER BY CHECKING THIS OPTION, YOU MAY NOT ALSO ENTER INTO AN AUTHORIZATION TO PAY BENEFITS CONTAINED IN ITEM #20 ABOVE.

ASSIGNMENT OF NO-FAULT BENEFITS
I HEREBY ASSIGN TO THE HEALTH CARE PROVIDER INDICATED BELOW ALL RIGHTS, PRIVILEGES AND REMEDIES TO PAYMENT FOR HEALTH CARE SERVICES PROVIDED BY THE ASSIGNEE TO WHICH I AM ENTITLED UNDER ARTICLE 51 (THE NO-FAULT STATUTE) OF THE INSURANCE LAW. THE ASSIGNEE HEREBY CERTIFIES THAT THEY HAVE NOT RECEIVED ANY PAYMENT FROM

NYS FORM 3NF (Rev 6/2004)

---

Extracorporeal Shockwave Therapy Notes

Date:___ 1.10.22___                     DOA: 9.20.21

Patient Name:

Patient Signature:

Initial Treatment:
Treatment 1:
Treatment 2:
Treatment 3:
Treatment 4:
Treatment 5:

ESWT (Extracorporeal Shockwave Procedure)

| Cervical Spine Highest Muscular Pain | | 0197T |
| Thoracic Spine Highest Muscular Pain | | 0197T |
| Lumbar Spine Highest Muscular Pain | ✓ | 0197T |
| Shoulder | Left | Right ✓ | 0197T |
| Elbow | Left | Right | 0197T |
| Ankle | Left | Right | 0197T |
| Lower Leg | Left | Right | 0197T |
| Feet | Left | Right | 0197T |
| Knee | Left | Right | 0197T |
| Wrist | Left | Right | 0197T |
| Hip | Left | Right | 0197T |
| Upper Leg | Left | Right | 0197T |

Total Number of Items___ 2

Doctor's Signature: ___

129.    Virtually all the Insureds identified in Exhibit "1" treated at Clinics that employed unlicensed technicians to perform the Fraudulent Services on Insureds, which were subsequently

billed to GEICO and other New York automobile insurers through multiple healthcare providers that did not perform or directly supervise the Fraudulent Services.

130.    Because the Fraudulent Services, to the extent provided at all, were performed by individuals not employed by Kenworthy and/or the Kenworthy Practices, the Defendants never had any right to bill or to collect No-Fault Benefits for that reason or to realize any economic benefit from the claims seeking payment for the Fraudulent Services, in addition to all others identified in this Complaint.

131.    The misrepresentations and acts of fraudulent concealment outlined in this Complaint were consciously designed to mislead GEICO into believing that it was obligated to pay the claim submissions.

### III.    The Fraudulent Billing Defendants Submitted or Caused to be Submitted to GEICO

132.    To support their fraudulent charges, the Defendants systematically submitted or caused to be submitted thousands of NF-3 forms, AOBs and medical reports/records using the name of the Kenworthy Practices and their tax identification numbers seeking payment for the Fraudulent Services for which the Defendants were not entitled to receive payment.

133.    The NF-3 forms, reports, AOBs and other documents submitted to GEICO by and on behalf of Defendants were false and misleading in the following material respects:

(i)     The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that Kenworthy had performed the Fraudulent Services and that his name, license and the tax identification number of the Kenworthy Practices were being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) despite the fact that the John Doe Defendants unlawfully and secretly controlled, operated and managed the medical "practice".

(ii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented and

> exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided.

(iii)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly concealed the fact that the Fraudulent Services were provided – to the extent provided at all – pursuant to illegal kickback and referral arrangements.

(iv)    The NF-3 forms, letters and other supporting documentation submitted to GEICO by and on behalf of the Defendants uniformly misrepresented that the Fraudulent Services were medically necessary when the Fraudulent Services were provided – to the extent provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

(v)    The NF-3 forms, letters and other supporting documentation submitted by, and on behalf of, the Defendants uniformly misrepresented to GEICO that the claims were eligible for payment pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.11 even though the services were provided by unlicensed individuals not employed by Kenworthy or the Kenworthy Practices.

## IV.    Defendants' Fraudulent Concealment and GEICO's Justifiable Reliance

134.    Defendants legally and ethically were obligated to act honestly and with integrity in connection with the billing that they submitted, or caused to be submitted, to GEICO.

135.    To induce GEICO to promptly pay the fraudulent charges for the Fraudulent Services, Defendants systematically made material misrepresentations, concealed their fraud and the underlying fraudulent scheme and went to great lengths to accomplish this concealment.

136.    Specifically, the Defendants knowingly misrepresented and concealed facts related to the participation of Kenworthy in the performance of the Fraudulent Services and his lack of control and/or management of the Kenworthy Practices. Additionally, the Defendants entered into complex financial arrangements with one another that were designed to, and did, conceal the fact that the Defendants unlawfully exchanged kickbacks for patient referrals.

137.    Furthermore, Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the Fraudulent Services were medically unnecessary and performed, to the extent they were performed at all, pursuant to fraudulent pre-determined protocols designed to maximize the charges that could be submitted, rather than to benefit the Insureds who supposedly were subjected to the Fraudulent Services. In addition, the Defendants knowingly misrepresented and concealed facts related to the employment status of the unlicensed individuals to prevent GEICO from discovering that the Fraudulent Services were not eligible for reimbursement because they were not provided by individuals employed by Kenworthy and/or either of the Kenworthy Practices.

138.    GEICO takes steps to timely respond to all claims and to ensure that No-fault claim denial forms or requests for additional verification of No-fault claims are properly addressed and mailed in a timely manner. GEICO is also under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations and fraudulent litigation activity described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO incurred damages of more than $165,000.00 based upon the fraudulent charges.

139.    Based upon Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

## AS AND FOR A FIRST CAUSE OF ACTION
**Against Kenworthy, the EK Sole Proprietorship, and the EK MD Sole Proprietorship**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

140.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

141.     There is an actual case and controversy between GEICO on the one hand and Kenworthy, the EK Sole Proprietorship, and the EK MD Sole Proprietorship on the other hand regarding more than $1,000,000.00 in unpaid billing for the Fraudulent Services that has been submitted to GEICO.

142.     Kenworthy and the Kenworthy Practices have no right to receive payment from GEICO on the unpaid billing because the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants and the Billing Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers.

143.     Kenworthy and the Kenworthy Practices have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to illegal kickbacks and referral relationships between the Defendants and the Clinics.

144.     Kenworthy and the Kenworthy Practices have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and were provided – to the extent that they were provided at all – pursuant to predetermined fraudulent protocols that serve to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds.

145.     Kenworthy and the Kenworthy Practices have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services were not medically necessary and

were provided – to the extent that they were provided at all – pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers.

146.    Kenworthy and the Kenworthy Practices have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

147.    Kenworthy and the Kenworthy Practices have no right to receive payment from GEICO on the unpaid billing because the Fraudulent Services fraudulently misrepresented that they were performed by Kenworthy and were instead performed - to the extent that they were provided at all - by unlicensed individuals who were neither supervised by nor employed by Kenworthy or either of the Kenworthy Practices.

148.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that Kenworthy and the Kenworthy Practices have no right to receive payment for any pending bills submitted to GEICO.

### AS AND FOR A SECOND CAUSE OF ACTION
**Against Kenworthy, the Billing Defendants and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

149.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

150.    The EK Sole Proprietorship is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

151.    Kenworthy, the Billing Defendants and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the EK Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail

fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the EK Sole Proprietorship was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants and the Billing Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not provided by Kenworthy or any other licensed physician, but by persons who were unlicensed, not directly supervised by Kenworthy or employed by the EK Sole Proprietorship. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

152. The EK Sole Proprietorship's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Kenworthy, the Billing Defendants, and the John Doe Defendants operated the EK Sole Proprietorship, inasmuch as the EK Sole Proprietorship never

operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the EK Sole Proprietorship to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the EK Sole Proprietorship to the present day.

153.    The EK Sole Proprietorship is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the EK Sole Proprietorship in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $57,000.00 pursuant to the fraudulent bills submitted by the Defendants through the EK Sole Proprietorship.

154.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A THIRD CAUSE OF ACTION
**Against Kenworthy, the Billing Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

155.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

156.    The EK Sole Proprietorship is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

157.    Kenworthy, the Billing Defendants and John Doe Defendants are employed by and/or associated with the EK Sole Proprietorship. Kenworthy, the Billing Defendants, and John

Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the EK Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the EK Sole Proprietorship was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants and the Billing Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not provided by Kenworthy or any other licensed physician, but by persons who were unlicensed, not directly supervised by Kenworthy or employed by the EK Sole Proprietorship. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

158.    Kenworthy, the Billing Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

159.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $57,000.00 pursuant to the fraudulent bills submitted by Defendants through the EK Sole Proprietorship.

160.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Against Kenworthy, the EK Sole Proprietorship, the Billing Defendants,**
**and the John Doe Defendants**
**(Common Law Fraud)**

161.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

162.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

163.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Kenworthy had performed the Fraudulent Services and that his name, license and the tax identification number of the EK Sole Proprietorship was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Kenworthy never performed any of the services and the John Doe Defendants and Billing Defendants unlawfully and secretly controlled, operated and managed the EK Sole Proprietorship; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly

54

misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Kenworthy, when in fact the services were provided by unlicensed individuals that were never supervised by Kenworthy or employed by the EK Sole Proprietorship.

164.     The Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the EK Sole Proprietorship that were not compensable under New York no-fault insurance laws.

165.     GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $57,000.00 pursuant to the fraudulent bills submitted by the Defendants.

166.     The Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

167.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Against Kenworthy, the EK Sole Proprietorship, the Billing Defendants, and the John Doe Defendants
### (Unjust Enrichment)

168.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

169.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

170.     When GEICO paid the bills and charges submitted by or on behalf of the EK Sole Proprietorship for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants improper, unlawful, and/or unjust acts.

171.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

172.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

173.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $57,000.00.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Against Kenworthy, the Billing Defendants and John Doe Defendants
### (Violation of RICO, 18 U.S.C. § 1962(c))

174.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

175.     The EK MD Sole Proprietorship is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affect interstate commerce.

176.    Kenworthy, the Billing Defendants and John Doe Defendants knowingly have conducted and/or participated, directly or indirectly, in the conduct of the EK MD Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges seeking payments that the EK MD Sole Proprietorship was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants and the Billing Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not provided by Kenworthy or any other licensed physician, but by persons who were unlicensed, not directly supervised by Kenworthy or employed by the EK MD Sole Proprietorship. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

177.     The EK MD Sole Proprietorship's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular ways in which Kenworthy, the Billing Defendants, and the John Doe Defendants operated the EK MD Sole Proprietorship, inasmuch as the EK MD Sole Proprietorship never operated as a legitimate medical practice, never was eligible to bill for or collect No-Fault Benefits and acts of mail fraud therefore were essential in order for the EK MD Sole Proprietorship to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the EK MD Sole Proprietorship to the present day.

178.     The EK MD Sole Proprietorship is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other New York automobile insurers. These inherently unlawful acts are taken by the EK MD Sole Proprietorship in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-fault billing. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $108,000.00 pursuant to the fraudulent bills submitted by the Defendants through the EK MD Sole Proprietorship.

179.     By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

### AS AND FOR A SEVENTH CAUSE OF ACTION
**Against Kenworthy, the Billing Defendants, and John Doe Defendants**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

180.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

181.    The EK MD Sole Proprietorship is an ongoing "enterprise", as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

182.    Kenworthy, the Billing Defendants and John Doe Defendants are employed by and/or associated with the EK MD Sole Proprietorship. Kenworthy, the Billing Defendants, and John Doe Defendants knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the EK MD Sole Proprietorship's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted fraudulent charges seeking payments that the EK MD Sole Proprietorship was not eligible to receive under the No-Fault Laws because: (i) the billed for services were submitted through a medical practice not legitimately owned or controlled by a licensed physician, but which was being operated, managed, and controlled by the John Doe Defendants and the Billing Defendants for purposes of effectuating a large-scale insurance fraud scheme on GEICO and other New York automobile insurers; (ii) the billed for services were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers, and as a result of illegal financial arrangements between the Defendants and the Clinics; (iii) the billed for services were provided, to the extent provided at all, pursuant to pre-determined fraudulent treatment and billing protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds; (iv) the claim submissions seeking payment for the billed for services uniformly misrepresented and exaggerated the level, nature, necessity, and results of the Fraudulent Services that purportedly were provided; and (v) the billed for services, to the extent provided at all, were not provided by Kenworthy or any other licensed physician, but by persons who were unlicensed, not directly supervised by Kenworthy or employed by the EK MD

Sole Proprietorship. The fraudulent billings and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described in the chart annexed hereto as Exhibit "1".

183.    Kenworthy, the Billing Defendants and the John Doe Defendants knew of, agreed to and acted in furtherance of the common overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of fraudulent charges to GEICO.

184.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $108,000.00 pursuant to the fraudulent bills submitted by Defendants through the EK MD Sole Proprietorship.

185.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## AS AND FOR A EIGHTH CAUSE OF ACTION
**Against Kenworthy, the EK MD Sole Proprietorship, the Billing Defendants, and the John Doe Defendants**
**(Common Law Fraud)**

186.    GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

187.    The Defendants intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of thousands of fraudulent charges seeking payment for the Fraudulent Services.

188.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) the representation that Kenworthy had performed the Fraudulent Services and that his name, license and the tax identification number of the EK MD Sole Proprietorship was being legitimately used to bill for the Fraudulent Services, making the eligible for payment pursuant to 11 N.Y.C.R.R. §65-3.16(a)(12) when in fact Kenworthy never performed any of the

services and the John Doe Defendants and Billing Defendants unlawfully and secretly controlled, operated and managed the EK MD Sole Proprietorship; (ii) the representation that the billed for services had been rendered and were reimbursable, when in fact the claim submissions uniformly misrepresented and exaggerated the level, nature, necessity, and results of the services that purportedly were provided; (iii) the representation that the billed for services were eligible for reimbursement, when in fact the services were provided, to the extent provided at all, pursuant to illegal kickback and referral arrangements between the Defendants and the Clinics; (iv) the representation that the billed for services were medically necessary when they were provided, to the extent provided at all, pursuant to the dictates of unlicensed laypersons, not based upon legitimate decisions by licensed healthcare providers; and (v) the representation the billed for services were eligible for payment because the services were provided by Kenworthy, when in fact the services were provided by unlicensed individuals that were never supervised by Kenworthy or employed by the EK MD Sole Proprietorship.

189.    The Defendants intentionally made the above–described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the EK MD Sole Proprietorship that were not compensable under New York no-fault insurance laws.

190.    GEICO justifiably relied on these false and fraudulent representations and acts of fraudulent concealment, and as a proximate result has been injured in its business and property by reason of the above–described conduct in that it has paid at least $108,000.00 pursuant to the fraudulent bills submitted by the Defendants.

191.    The Defendants extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

192.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### AS AND FOR A NINTH CAUSE OF ACTION
**Against Kenworthy, the EK MD Sole Proprietorship, the Billing Defendants,
and the John Doe Defendants
(Unjust Enrichment)**

193.     GEICO incorporates, as though fully set forth herein, each and every allegation in paragraphs 1 through 139 of this Complaint as if fully set forth at length herein.

194.     As set forth above, the Defendants have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

195.     When GEICO paid the bills and charges submitted by or on behalf of the EK MD Sole Proprietorship for No-Fault Benefits, it reasonably believed that it was legally obligated to make such payments based on the Defendants improper, unlawful, and/or unjust acts.

196.     The Defendants have been enriched at GEICO's expense by GEICO's payments, which constituted a benefit that the Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

197.     Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

198.     By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $108,000.00.

### JURY DEMAND

199.     Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company demand that a Judgment be entered in their favor and against the Defendants, as follows:

A.      On the First Cause of Action against Kenworthy, the EK Sole Proprietorship, and the EK MD Sole Proprietorship, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that Kenworthy, the EK Sole Proprietorship, and the EK MD Sole Proprietorship have no right to receive payment for any pending bills for the Fraudulent Services submitted to GEICO;

B.      On the Second Cause of Action against Kenworthy, the Billing Defendants and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $57,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

C.      On the Third Cause of Action against Kenworthy, the Billing Defendants, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $57,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.      On the Fourth Cause of Action against Kenworthy, the EK Sole Proprietorship, the Billing Defendants, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $57,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper;

E.      On the Fifth Cause of Action against Kenworthy, the EK Sole Proprietorship, the Billing Defendants, and John Doe Defendants, more than $57,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper;

F.      On the Sixth Cause of Action against Kenworthy, the Billing Defendants and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $108,000.00 together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.      On the Seventh Cause of Action against Kenworthy, the Billing Defendants, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $108,000.00, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

H.      On the Eighth Cause of Action against Kenworthy, the EK MD Sole Proprietorship, the Billing Defendants, and John Doe Defendants, compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $108,000.00 together with punitive damages, costs, interest, and such other and further relief as the Court deems just and proper; and

I.      On the Ninth Cause of Action against Kenworthy, the EK MD Sole Proprietorship, the Billing Defendants, and John Doe Defendants, more than $108,000.00 in compensatory damages, plus costs and interest and such other and further relief as this Court deems just and proper.

Dated: June 23, 2022

RIVKIN RADLER LLP

By: _/s/ Barry I. Levy_____
      Barry I. Levy, Esq.
      Michael Vanunu, Esq.
      Allison N. Stapleton, Esq.
926 RXR Plaza
Uniondale, New York 11556

*Counsel for Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company and GEICO Casualty Company*